The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Please be seated. We will proceed to the final case of today. I should say the one case that's keeping us from completing our calendar for the week. We'll hear from the appellants. Good morning, and may it please the court. Robert B. Gilmore of Stein Mitchell for the plaintiff appellants. This case involves a heavily litigated default judgment, which this court affirmed on appeal, and which the plaintiffs then sought to enforce against the appellees, who I will call DIGI, to recover the money and ownership interests that DIGI had helped steal from plaintiffs. The district court, however, took the extraordinary and unwarranted step of voiding the judgment after concluding that it lacked subject matter jurisdiction. In so doing, it committed three errors, each of which warrants reversal. You skipped a few steps, didn't you? I mean, initially the district court said it was okay. Then wasn't there a change of the, some kind of a morphing of the parties here? I mean, that's where this case gets a little confusing. You say as though it's been one defendant, but it's kind of maybe one in your view, but speak to that. No, we acknowledge there were the original defendants. One of them, ITB, is also an appellee here. And the court examined subject matter jurisdiction quite thoroughly at the district court level, and then it was appealed when the original defendants filed a Rule 60b-4 motion, also challenging subject matter jurisdiction, asking that the default judgment be thrown out for lack of diversity. The district court rejected that first ruling. On a different ground, though. On a different ground. Lack of subject matter jurisdiction. They argued originally that one of the defendants was a citizen of Virginia. That's media aware. That's media aware, exactly. You've got to call out the names because this thing is confusing enough. You brought us a very convoluted case with a whole lot of moving parts. So go slow with us. Maybe a good place to start. I know you want to sort of put DIGI together and sort of call it one entity. Help me understand sort of as a starting point. I understand ITB is a party, and I want to sort of put them aside. But the rest of these entities, DIGI and the various other shareholders, help me understand. They're non-parties, right? They were not party to the underlying litigation in any respect. That's correct, although as we showed in our papers, they learned of the judgment and they violated the injunction. I know, but I'm not asking. You can get to the next question if you want to. I want to make sure we're clear. They're non-parties for purposes of the original injunction and order that was issued. Correct. Okay. And so here's what I'm trying to figure out. Let me back up a second and sort of ask it in maybe a roundabout way, just maybe just a broad stroke. But if I've got a seller, and I'll call him Sam, and Sam sells 60% of his company to two different people, right, unknowns to each of them. He delivers to person A but doesn't to person B. Person B sues Sam and says, you know, I want my 60%. Doesn't include person A as somebody that's involved. The court then enters an injunction that person B owns the company or 60% of the company. What is person B to do? I mean, just as a practical matter, right, so, you know, person B now has 60% of the company, but person A, who legitimately also has a right to 60% of the company, has no remedy, I think, as you've sort of described it, to do anything. What's person A supposed to do in that scenario? I understand that's not this scenario because you say knowledge and all these things, but I want to, just the more basic question. Well, they would arguably have standing to make Rule 60B for arguments if they had not been made to begin with. But they don't because Rule 60 requires to be a party or a representative of a party, right? So that's what Rule 60B says, right? It doesn't allow non-parties to bring, and we'll talk to your colleagues about this in a minute, but it doesn't allow for non-parties to bring Rule 60B motions. I think they'd have to intervene, and they could have done that. They knew about the judgment and learned about the judgment. We think that they knew about the injunction before they bought the property. I think there's evidence of that. But there's no dispute that they knew of the judgment just a month or two after the court issued it. So they could have intervened and said, hold on, we're the purchaser here, and so our rights have been adjudicated. All right, but let's assume for a minute they don't intervene because in this hypothetical, they're foreign citizens, right? They don't have any ties to the United States, and they say we don't intervene, just hypothetically. Now what do they do? What's another option for them? Is that the only option, I guess is what I'm getting at, is for them to affirmatively intervene, and otherwise you've bound them based on a judgment that doesn't involve them about the ownership of a company that they have every right to? Well, we don't think that they are. We have to prove that they're bound. That's what the motion to enforce the judgment, the proceeding was in the first place. Because they were a non-party, we brought them in because under contempt theory or successor and interest theories, that they could be made liable for the judgment or found in contempt of the anti-transfer injunction, and so therefore face contempt sanctions. That's what the case was about, and that's what was proceeding below. Judge Brinkman initially said, we think that there's at least a prima facie showing that they may be liable under contempt, and that is intertwined with the jurisdictional issue. And she ordered discovery, which had started, to resolve this issue of did they know about the injunction, and did they act in concert with the original defendants to violate it? And we had deduced evidence that certainly showed that they had. That was then, that whole proceeding, though, was what was terminated prematurely when the defendants raised, I mean the respondents, I'm referring to as DIGI, raised a Rule 60b4 motion. By that you mean DIGI and other non-parties and ITV, who is an actual party. Correct. Yeah, ITV, which was an original defendant, as well as the new non-party respondents. And they filed a second Rule 60b4 motion in the case. That was barred by res judicata because these entities were in privity with the original defendants who had filed the first Rule 60b4 motion, one that was fully litigated, denied by the district court, and affirmed on appeal. And the privity argument you're making is because they're shareholders, they are in privity. So all shareholders are in privity with other shareholders. It goes beyond that in this case. So it's not merely the fact, although certainly that is one criteria that supports privity. But here we have the extraordinary circumstance where the original defendant, Borsi, wrote a detailed letter to the executives, the representatives of DIGI in middle of 2007, where he laid out his plan that he was going to file a Rule 60b4 motion that would save all of them because their interests were all aligned. They all had taken this company. So that's great for knowledge, but I don't understand how that has anything to do with privity. He was representing their interests. So in the diversity case, we look at Virginia's law. Lee v. Spoden says, we want to look at whether the litigating defendant, the litigating party was representing the interests of the absent party who is now being said to have been in privity. And that's what was happening. He was saying, look, I know that we're now facing this. We want to keep this company. We don't want to keep it away from the plaintiffs, and so here's my plan. I'm going to file this Rule 60b4 motion. That's exactly what he did. They knew about it. They stood to benefit from it. Their interests were all aligned. He was represented by counsel, experienced U.S. counsel, in filing that motion. The district court heard it, denied it. He then appealed to this court, and this court denied it. And so in doing so, the court made a number of statements about the arguable basis standard for evaluating Rule 60b4 motion, which is the second error that the district court made. So the district court on the res judicata point erred because it didn't even really undertake the analysis. It made the mistaken ruling that res judicata never applies to subject matter jurisdiction. That's wrong. Digi doesn't even try and defend it in court in its appeal. So all it's making are arguments about, well, this is really issue preclusion. That's incorrect. This is a claim preclusion question. But the arguable basis standard hinges on this showing of privity, right? If you don't have privity, then the standard changes. Well, this court has never held that. And the only court, they cite the D.C. Circuit, which is the only circuit, and the D.C. Circuit recognized that it was adopting a standard for non-parties bringing Rule 60b4 motions that departed from the arguable basis standard that no other circuit has adopted. No other circuit has recognized that distinction. And even in the Bell case from the D.C. Circuit, they said, well, we probably would continue with the arguable basis standard where privity applied. So we think there was privity, but we think that the standards in this case are clear, that it's an arguable basis. And really the importance of the arguable basis standard is the importance of finality of judgments. You can't simply constantly relitigate issues at termination and final litigation of a matter. So the arguable basis standard was simply not followed by the district court. The court paid lip service to it, but then undertook an analysis. And if you look at the two main points, first of all, the original defendants and the current respondents, they all affirmatively described Hungarian KFTs as corporations. They admitted that in their answers. They affirmatively described themselves as Hungarian corporations in their court filings. And so that alone is evidence that gave rise to an arguable basis. It's not a do-over to see in the first instance what's the right answer, although we think even if that was the right question that we would come out in the right. But the question is far different. It's was there any arguable basis? Was the exercise egregious? Those are the standards that this court articulated in its first decision in this case. Given the defendant's own affirmative repeated statements in court filings, as well as other contemporaneous documents that the KFTs are Hungarian corporations, there is surely an arguable basis. This court said in its first ruling that the defendant's, the appellant's statements, certainly provided an arguable basis to conclude that there was diversity of citizenship. But the court just ignored those admissions. Instead, it focused on a handful of e-mails that were sent to plaintiffs by employees of defendants many years ago that referred to KFTs as limited liability companies. There was no reason, though, for the district court to credit those e-mails and hold them against plaintiffs when the defendants also described the KFT entities as corporations in court filings. So you have this competing evidence. And even when you look at the language that the court gave in its own ruling, it said that the issues were difficult and underexplored, that there were no cases analyzing the question, that there was slipperiness in the criteria. And then it ultimately came out by merely ruling that a Hungarian KFT, quote, to LLCs than to corporations. So those are, given that analysis, under the right arguable basis standard, there's no way that the court properly could have voided its judgment. And finally, turning to Rule 21, Rule 21 is designed for this kind of situation, where there's a misjoinder of a supposedly non-diverse defendant. The court abused its discretion in not even undertaking the Rule 21 analysis. The dispensable party, Petrofia, was a marginal party. It could be easily severed from this case. It should have been severed. There would have been no prejudice. I see my time is up for the first 13 minutes. Do you have some time reserved for rebuttal? I do. Thank you. We'll hear from the appellee. May it please the court. I'm Chris Landau, and I'm here today for the appellees. I'd like to reserve five minutes for rebuttal in light of the cross appeal. I think each of your honors asked the critical question, and one way or another alluded to the question, or to the critical point here, which is that Digi is not the same as Borsi, the underlying defendant. Borsi may well have defrauded these plaintiffs and done other terrible things and may be subject to a money damages judgment in Virginia. What is so unusual here is that 10 years after getting a default judgment against Borsi and the other defendants, the plaintiffs filed this kind of unknown thing. I've never seen it in 30 years of practice, a motion to enforce the judgment against non-parties to the judgment. Talk to me for a second about the non-party point. He wants to claim that you're – I'm going to put ITV aside for a second. Sure. About Digi and other respondents. He claims that they're in privity. I assume you disagree with that. Vigorously, your honor. Right, and I get that. I don't want to stop there. The question I've got is for those non-party respondents, Digi and I'll call them affiliates, how do they have standing under Rule 60B?  They're not a legal representative of a party. Right. And Rule 60B says a party or legal representative may. Right. Help me understand how those entities have an ability to even bring the 60B for motion. Your honor is perfectly encapsulating the anomalous nature of this entire proceeding where they have sought to enforce a judgment against a non-party. No, no, I totally get that. It's a Borsi and not – I'm not trying to figure out all of your problems. You're going to have a lot of them. What I want to sort of figure out is I've got to answer one question, right, is did the district court get it right on the 60B for motion? And one way of getting there is to say, sorry, Digi, I'm really sympathetic, and probably at the end of the day you were going to win. However, you don't have standing to bring a Rule 60B for motion, and ITV, you've got res judicata problems. And then we get maybe to your cross appeal and all kinds of other questions. But help me understand why that's not like the simple way out of the 60B for problem. It creates maybe more problems for you on remand or more problems for us on alternative affirmance. But help me know why that's not right. Well, your honor, I think the answer, you're absolutely correct that textually Rule 60B says a party or representative, I have 60B right here. A party or legal representative. A legal representative, exactly, can bring such a motion. We are certainly a putative party in the sense that they're trying to enforce a judgment against us. Again, when you think about what is Rule 60B? But they're not trying to enforce it. I mean, that's the problem, right? I mean, I guess we've got to decide whether you are a successor in interest or a party in some meaningful sense to determine whether you have standing. I mean, the standing question is a threshold one for us. Right. We don't think we are. We are clearly not a party as we stand here today, right? That's the thing. You've got the other side to concede that, right? But they are certainly alleging that we stand in the shoes of the party. So for their premise of their motion, at least, is that this judgment should be enforced. But aiding and abetting doesn't necessarily have that implication, right? That you could, in theory, be liable under aiding and abetting for contempt, maybe not for the judgment, but for contempt, and not be a party at all, right? If their theory works. I'm not saying the theory gets you here in jurisdiction. I'm not trying to get to those questions. No, I understand that. I'm just saying, though, that when they come in with a motion to enforce a judgment, as they did here, again, it's a unicorn in the law, what they've tried to do here. Did they serve that motion, serve process? They did. Okay, well, it seems to me that even though you contest vigorously the question of subject matter and personal jurisdiction, at least for purposes of that, you're entitled to raise the motion. I think they have made us, again, a party for purposes of the motion to enforce, not to the underlying judgment. I think Judge Diaz, you're exactly correct on that. So it's only natural when somebody comes at you and says, I'm going to enforce a judgment against you and I properly serve you with the papers, and I'm a stranger to the original judgment. I come in and I bring a lot of arguments. I say, wait a second. This is the strangest thing ever. I live in Hungary. We are Hungarian and Romanian companies. These folks are trying to enforce a judgment that is not a judgment against us. So we say that. And we also say, and by the way, as we look at it, this default judgment that was entered 10 years ago has its problems. And I totally get that. And I think you've, at least I'll hypothesize that you've got great arguments on that point. The challenge I've got is, under the rule, you're not technically a party to the judgment you're attacking. So 60B4, you're attacking a judgment. You're not a party to that judgment. And the oddity is, is if you prevail on that, then Borsi, who we'll just claim is the real bad actor here, it voids his judgment too. And if he showed up, he would have a very hard time making that claim. You show up and now make it. It seems like to me your argument is this should not be enforceable against me. That argument I get. The underlying judgment being void, I'm not sure how you have standing to make that argument. Well, Your Honor, again, I think that Judge Diaz, at least the rule itself, doesn't draw the distinction between a party to the enforcement proceeding, which we were served and brought into the enforcement proceeding, versus a party to the underlying judgment. Again, this is such a mind-bender of a case because they're trying to do a thing that doesn't exist in our law, and it's not set up for this. In other words, they've made us a party to this proceeding, so we show up. They properly served us. And then the question is, well, does that mean that we have to have our hands tied behind our back and we can't point out the problems with the underlying judgment? But it says may relieve a party from a final judgment, right? It seems to me that's talking about a party to the judgment. You're not a party to the judgment. I mean, I don't think you want to admit you're a party to the judgment, right? Of course not. Right. I mean, Your Honor, again, there's many ways to skin this cat. I mean, this is so crazy on so many levels. And, you know, certainly we think we have very – I understand your point about whether or not we should be able to bring a Rule 60B motion. I mean, if, in fact, we're not able, and, again, we think we are given the fact that we've been hailed into court halfway across the world, we decide to show up. We could have had a choice at that point, whether we just stay in Hungary and Romania and say, wait a second, this has nothing to do with us. Well, let's assume that you could bring that motion. One of the concerns I have is whether – and I realize that Judge Brinkman had a great deal of discretion with respect to whether or not to sever this otherwise dispensable party. But your colleague over there raised a number of issues about the uncertainty of what this entity was, pointing out that you yourselves were confused about what the entity was. And it struck me that Judge Brinkman primarily relied on the fact that you all weren't diligent enough or the other side wasn't diligent enough in sort of ferreting this out before bringing the LLC into the equation. And I'm a little bit concerned about that, given all the uncertainty and the amount of time it took to figure out that this entity was, in fact, an LLC. Two quick points, Your Honor. First of all, they make a res judicata argument that's separate from their oral basis argument. The second really negates the first, because the way that parties deal with the res judicata issue in the context of a party who has the opportunity to challenge the judgment is to say it's not pure res judicata in its crystalline form, it's arguable basis. So res judicata basically means you are barred. If it's real res judicata, you cannot do it. The courts have recognized that it's an arguable basis when a party who has previously showed up to defend the judgment has not made a particular argument or not raised a particular defensive claim. Again, I think the point is we are not BORC, so the arguable basis standard doesn't apply to us. I think Your Honor alluded to this point earlier, unless they establish privity, which is a very narrow exception to the rule that basically if you have a judgment against A, A does not bind B, and they say, well, you have some generally similar interests. Well, let's assume we agree with you with all of that. The question is, okay, as a matter of discretion, why wasn't it an abuse of discretion for Judge Brinkman not to sever under these circumstances? Right, because, Your Honor, the judge found, and she looked at these documents, and she was close to this case, having lived with this case now for more than 10 years. Particularly if you look at the deed of association for Peterfia, which is the company at question, and that's at J.A. 1291 to 1297. I think you look at that on the one hand, and you look at the governing law on corporations versus all kinds of other membership business associations. This is not an area of the law that's subject to a loosey-goosey balancing test where the Supreme Court says we'll put it on the corporation side or the LLC side of the line as we see it. If you look at Americold, the most recent case on this, 2016, the Cardin case, there is a very bright-lined rule in this area. Can you talk to me just a second, and I'm not trying to play gotcha, but the Russell decision involving the limited partnership out of Puerto Rico, I'm not trying to play gotcha if you're not that familiar with it, but there the Supreme Court said we look at Puerto Rico's civil law, and we determine that a limited partnership is like a corporation. Tell me why, in light of Cardin's characterization of that, right, the identification of an exotic entity under civil law unknown to this kind of law, why wouldn't that same analysis apply to Hungarian civil law with respect to KFT? Because, Your Honor, I think Cardin and subsequently Americold made it very clear that that case basically got limited to nothing, that they decided we didn't want to open ourselves. I mean, you know, it says it could be. I mean, Cardin is the most explicit about it, but it doesn't say, it does not hold, and we're sort of bound by cases until they're overruled, right? It doesn't say that it's actually limited to Puerto Rican limited partnerships, and so the challenge that I've got is if I read Russell, even in light of Cardin and sort of narrowing down, it doesn't eliminate Russell, and why doesn't that apply given the Hungarian civil law that we're looking at? Your Honor, again, I urge you to look at the document called the Deed of Association for Petrofea, which is at JA 1291 and 97, where this is now, it's an English translation, but it's a signed English translation because Plaintiff Hawkins doesn't speak Hungarian, obviously, so he has his own signature on there. It not only calls this a limited liability company, but the key point is not just a label or a name. It makes it clear that he is a member of this, and it gives him a 35 percent membership interest in all other kinds of— But in Russell, it was a partnership, right? And we all agree partnerships don't get it, right? And, you know, they use the Spanish name, which you probably know I do not, but it's a partnership interest, right? And so, I mean, if anything, a membership interest is more like a corporation than a partnership interest. Your Honor, all I can say, the district court looked at this. The district court said this is not a closed question. But didn't look at Russell, right? It's looking at the Seventh Circuit, sort of compared these two analyses. What it's not looking at is the civil law system and how, at least in Russell, the court treats that as different from our common law system. I think the key point is the district court felt that the plaintiffs had not been candid at the outset with her, at least about bringing some of these things to their attention. And, frankly, she said, you know, that they haven't— there's abundant evidence which has gone undiscussed by plaintiffs that these things are membership. There's some of that going both ways, right? And there's some blame both ways on that idea. Your Honor— But get back to the sort of idea of why— I think you're just saying I need to ignore Russell because Cardin and Mericold basically eliminated— I think basically jump ball goes to not corporation. I think Cardin and Mericold make it very clear that those are very limited things, that the membership—that the corporation having its own citizenship is limited to very unique kind of corporation where you have, like, if I want to buy shares in Apple, that doesn't make Apple my citizenship. But when you look at the documents on pedophilia, I think you cannot conclude that this is anything but very clear that it's a membership thing and so it belongs—the citizenship goes to the members. I don't want to miss—I see my—I'm turning yellow already, but I want to make sure to underscore what's kind of a fundamental anomaly of this case, which is the district court in this case could have just entered a money damages judgment here in Virginia against Borsi and the other bad—the alleged bad actors in the original lawsuit. What the district court did, though, is more than that. The district court purported to assign the ownership of Hungarian companies in Hungary listed on the Budapest Stock Exchange. The other side comes in at a fundamental level and says, you digi are bad people because you did something wrong and you bought this company, ITV, and they allege knowledge of the injunction. Again, there's a factual dispute about knowledge. But our point is, regardless of that, we are entitled as a Hungarian company to buy another Hungarian company with an absolutely clear title on the Hungarian Stock Exchange, which is the Budapest Trade Registry is what determines the ownership of companies. In the original default judgment, the court was way out of line to purport to adjudicate the ownership of Hungarian property. All true if you're a bona fide purchaser, but their response is you're in active concert with them, and at least by allegation, that makes you liable. It might not make you subject to jurisdiction. I think this is so important that if somebody comes— if I want to buy my next-door neighbor's house in Montgomery County, Maryland, I'm entitled to go to the registry of deeds of Montgomery County and see do I have a clear title. If somebody faxes me, something says, I have an Italian judgment against the seller. You shouldn't buy that. That doesn't mean—an Italian judgment is not self-executing here, just as this judgment is not self-executing in Hungary. There's nothing wrong with a Hungarian company buying another Hungarian company with clear title on the Budapest Trade Registry. The challenge with that is 65D2C refers to actual knowledge. It doesn't require formal notice. It's actual knowledge. 65D2C, which is the aiding and abetting provision, is actual knowledge, and at least as alleged, you all had actual knowledge. As alleged, I'm going to say this. Even assuming that you credit the facts their way, which there's a very vigorous dispute about that, but the point is the fact that 65— Rule 65 is a rule of civil procedure. Under Rule 82, it doesn't expand the court's jurisdiction. I totally get the jurisdiction point, right. And so I guess the point that I'm making is that there is nothing wrong with somebody— just like there's nothing wrong with me in Montgomery County buying my neighbor's house, even if somebody flashes an Italian judgment in front of my eyes, I'm not committing contempt of the Italian court by proceeding to buy that house because that Italian judgment is not self-executing on me. This is the fundamental flaw in their position, that somehow we have done something bad in Hungary just by purchasing a Hungarian corporation with clear title. They never made any effort to record any ownership interest, to this day, with the Hungarian Board of Trade on these shares. They just have some Virginia— You are getting into your— I see that, Your Honor. I will reserve the balance of my time. You can do so if you like. I'm just letting you know that's what you're doing. I appreciate it, Your Honor. All right. Thank you. Any questions to hear from to rebuttal? Judge Richardson, I want to pick up on the last point that you made, that Rule 65d anticipates contempt proceedings for third parties that violate orders. Much of the argument that you heard from opposing counsel had to— this wholly unique situation. But, in fact, there are a number of cases, and we've cited those in our briefs. And, in fact, counsel for Digi is involved in one of those cases before this court, the Rex Ventures case, which we pointed out, where a third party that's overseas is alleged to have knowingly violated an injunction issued by one of this country's courts. And a number of courts have ruled that third parties that otherwise are beyond the jurisdiction of a court, but that knowingly violate a court's order, subject themselves to that court's jurisdiction. Most of those cases, at least the published ones, and certainly the Court of Appeals decisions, either involve U.S. citizens, which I think are readily distinguishable, or they involve beyond the jurisdiction of that court, but within the nationwide jurisdiction of the court. What I can't figure out is how, under the due process principles, you can expand that to Hungary, someone who is not within the nationwide. I think it's the Fifth Circuit's decision that you primarily rely upon. It's based on this idea that there's nationwide jurisdiction. And I get that, but I don't see how you make that subsequent jump, at least without U.S. citizenship, even if that's a reasonable distinction, to a purely foreign entity that is purely abroad. And now maybe that needs to be remanded to decide, but help me understand why we ought to expand jurisdiction that broadly. Well, there are cases that say that if you knowingly reach into a jurisdiction and violate that decision, then the due process minimum context is satisfied. Now, I agree that we need to remand it. That would be true if you reach in and do something in Virginia. So if they accepted a bank transfer from a bank in the United States, I get that. If there's some actual action or receipt of information being shipped from California to Florida or being shipped from Virginia to Hungary, but what they did is all in Hungary or maybe other countries in that area. No, actually, the American plaintiffs made investments, gave money here that was then invested into Hungarian companies. But the transactions, the negotiations occurred in the U.S. So there's certainly a nexus there. But your whole point is that money didn't go into ITV, right? No, it went into ITV. Just the ownership of ITV was stolen from the plaintiffs. That's the problem. They contributed both work, but they also contributed capital, and all that was stolen. So American monies negotiated here in the U.S. went into companies overseas that the defendants, the respondents, acted in concert with the original defendants to abscond with. But we need to remand the case to the plaintiffs. Help me understand. What is the contact with the plaintiffs? Focus on the DIGI and its affiliates. What did they do that touched the United States in any way? Help me understand that. Well, the acquiring ITV that contained the investments and had these Americans working and contributing to develop the cable technology. So it is based on the idea that you sent money to Borsi. Borsi, at least allegedly, put the money in ITV. He didn't keep it himself. That's the allegation you're making here. Right. We don't know that. We don't know exactly. But in theory, that would be the basis. And then they bought shares in ITV. Correct. And that subjects them to jurisdiction in the United States? In violation of the injunction, the anti-transfer injunction. Now, we were proceeding with discovery, and that was prematurely ended. And the reason why we brought this enforcement proceeding now is because we had learned that and had reason to believe that there were other American contacts, given that DIGI was preparing an IPO and working with American investment banks. Make it clear to us, do you seek sanctions for violations of the injunction, or are you seeking forced injunction? So two theories. One is contempt. And sanctions under contempt, which can include compensatory monetary sanctions. And then the second would be successor in interest. And under Rule 25C, a party that is a successor in interest to an original party, essentially stepping into shoes here of BORCI. BORCI was the owner of ITV. Can you give me the site in the JA where you argue that DIGI, and I'll call them DIGI's affiliates, not ITV, but DIGI and DIGI's affiliates, that they were the successor in interest to BORCI and not one of the companies, but the person, BORCI the person? Where in the district court have you ever made that argument? Well, the whole issue was the ownership of ITV. BORCI was the original shareholder. We were supposed to get it. Instead, he transferred the ownership. Is there anywhere in the record that you said that they were the successor in interest to BORCI? I believe that it was in our original motion to enforce the judgment. I don't have that specific insight in front of me right now, Your Honor. So if it's anywhere, it will be in the original motion to enforce the judgment? That would be correct. And you'd agree if instead you said they're the successor in interest to a company and not BORCI, then you have waived the argument that they're a successor in interest to BORCI by raising it for the first time on appeal? If that's true. I'm not looking at the document either. I mean, if we didn't make an argument that we should have made below, then we wouldn't be raising it here the first time. Whether we had made the argument as crisply or as forcibly as we should have below is, I think, a separate question. Let me address in my brief remaining time the due process point. This case should go back to the court, because DIGI was being afforded an opportunity to be heard in an evidentiary proceeding on a full record to contest whether it could be made liable on a contempt basis or a successor in interest. So the due process issues are simply premature. That's the whole point of this proceeding. We're not seeking that they instantaneously, without any ability to mount a defense, are liable. We're simply saying we need to have a full record, and then the court decide based on an evidentiary hearing. And I think we've addressed the personal jurisdiction arguments. We asked the court reverse, reinstate the judgment, and remand the case for further proceedings. Thank you. All right. Thank you, Your Honor. Very quickly, just to finish up on this point, if you look at pages 445 to 446 of the motion to enforce, they are going through some factors for successorship. They are all based on ITV. There's no allegation there that they're saying we're a successor to Borsi. And again, that would be kind of a very strange proposition that by doing a business deal with somebody, we bought this company, ITV, from Borsi. We were going around Hungary and Romania and buying up small cable companies. One of them was this one from Borsi. But there is no allegation here that we are Borsi, that we were involved with Borsi before this transaction, or that we were involved with Borsi after this transaction, except insofar as he retained some minority interest in this company until we later bought him out. So this is entirely different from the kind of cases where you have, you know, a single shareholder who may be in privity with the corporation, if he or she is the one really directing the litigation. This is neither a privity situation, which has to be a very close legal relationship, nor a successorship situation. And if you look at their pleadings, they just kind of invoke Rule 25C as if that's the be-all and end-all to establish successorship. Rule 25C, again, is a rule of civil procedure that doesn't set forth a substantive basis for successorship. That has to come from state law. They seem to think that they can just wave around Rule 25C, and then that's enough to reach the very significant substantive conclusion, not procedural, substantive conclusion of successorship. At a more fundamental level, their argument on Rule 65 is complete bootstrapping, because what they say is that, well, you guys being digi was strangers to the judgment. They say, well, you knew that there was an injunction against Borsi. Well, even if that is true, which again, we're not conceding, that doesn't subject us to the personal jurisdiction of the district court. That doesn't create a minimum contact. That's the only minimum contact that they have alleged. They have to come up with some kind of a prima facie case for the court to establish personal jurisdiction. They've never alleged anything else. Their whole theory is that Rule 65 alone creates that minimum contact. And going back to my earlier point. What about his argument that money from Virginia went into ITV, and that somehow means that digi is subject to the jurisdiction here? That doesn't work. That might provide a basis for ITV. But what they're trying to do here is go beyond ITV and start saying there's minimum contacts against these other people who are the buyers of ITV. That's a totally different kettle of fish. I could buy an asbestos company, and I may be stuck with the liabilities that come with that asbestos company if I don't exclude them. But that doesn't mean that suddenly I have all the same contacts with some other disinformed as that company. Same reason we separate parent companies and subsidiaries. A hundred percent, Your Honor. And they have not tried to do a veil-piercing theory. In fact, now again, their successorship theory isn't even successor to ITV. It's successor to BORCI in some way. So the whole thing doesn't really make any sense. I think that the key point, though, again, is that we bought a company, as we were doing all over Hungary and Romania, and the most they can say is that, well, you acknowledge that the company you bought was subject to some foreign judgment that put a cloud on the title. But it didn't put a cloud. The way you put a cloud on the title of something is by going over to the place where the title is located. This is kind of an in-rem problem here. To the extent the court purported to adjudicate the ownership of property in Hungary, vis-a-vis Hungarians, that is what makes this case so strange. And they're saying a Hungarian company did something wrong by buying another Hungarian company with a clear title on the Budapest Stock Exchange. Whatever document they were waiving from the Eastern District of Virginia doesn't at all change the legal status of anything in Hungary. That's as if I live on a mountaintop in Nepal. I've never left Nepal. And I want to buy my neighbor's property in Nepal. A district court in Virginia can't exercise personal jurisdiction over me just because they allege that I knew that that property was, that there was a judgment in Virginia saying that the husband or the wife had an ownership interest in that property if they never made any attempt to record that judgment in Virginia. This is very much like the Ninth Circuit's Reebok case where the plaintiffs never made an effort to enforce or record a judgment in a Luxembourg court. And so, therefore, a Luxembourg bank was not bound. The distinction they try to make with Reebok is that it was in violation of the Luxembourg law. Why does that not matter? Well, Your Honor, because it's the same thing here. The way you kind of bring the foreign judgment into compliance with Luxembourg law is to go and record the judgment so that it becomes part of the Luxembourg procedure. Here, again, they never made any effort to come over to Hungary to record the judgment. And so we don't do anything bad when we look at the Hungarian registry and we see no clout on that. That doesn't, it's total bootstrapping to say that, well, that means that we are in aiding and abetting in violation of the underlying Virginia judgment and that that creates the minimum contact to make the Virginia court have personal jurisdiction over us in the first place. And I think just a quick point, the D.C. Circuit's jurisprudence on this whole arguable basis is entirely consistent with this court's jurisprudence and every other court's jurisprudence. It says the arguable basis, and this is Bell Helicopter, which goes back to Justice Ginsburg's earlier opinion for that court in practical concepts. Even a party is perfectly entitled to sit back, if you're abroad, if you are sitting on your mountaintop in Nepal and somebody brings a suit against the United States, you're perfectly entitled to sit back, not participate in that, and then if somebody tries to enforce it against you, defend yourself on subject matter jurisdiction grounds and not under some heightened standard if you don't participate. The people who do participate are stuck with the higher standard, but people who don't, like non-parties, are not. So for those reasons, Your Honor, we ask you to affirm the judgment. Thank you. Thank you for your arguments. We will come down and bring Ken to the jury.
judges: James A. Wynn Jr., Albert Diaz, Julius N. Richardson